T.C. Memo. 1996-171


UNITED STATES TAX COURT


LUMBER CITY CORPORATION, f.k.a. NEIMAN-REED
LUMBER AND SUPPLY COMPANY, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16056-93.                    Filed April 10, 1996.


Michael T. Anderson, Robert M. Jason, Kevin O'Hara, and Thomas A. Greco, for petitioner.

Donna F. Herbert and Mark A. Weiner, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge: Respondent determined the following deficiencies in, additions to, and accuracy-related penalties on petitioner's Federal income tax:

| | | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| Year Ended | Deficiency | Section 6653(a)(1)(A)[1] | Section 6653(a)(1)(B) | Section 6653(a)(1) | Section 6653(a)(2) | Section 6661(a) |
| Feb. 29, 1988 | $352,217 | $17,611 | * | $ -- | -- | $88,054 |
| Feb. 28, 1989 | 398,225 | -- | -- | 19,911 | * | 99,556 |

| Year Ended | Deficiency | Section 6662(a) |
|---|---|---|
| Feb. 28, 1990 | $863,235 | $172,647 |
| Feb. 28, 1991 | 366,344 | 73,269 |

* 50 percent of the interest due on the portion of the underpayment attributable to negligence.

The only issue remaining is to determine the amount of the deduction for petitioner's taxable year ended February 28, 1990, to which petitioner is entitled under section 162(a)(1) for reasonable compensation paid to Jesse Ruf, its sole shareholder and chief executive officer (CEO). We hold that the amount of the deduction to which petitioner is entitled is $1 million.

## FINDINGS OF FACT[2]

Petitioner, Lumber City Corp. (Lumber City), is a California corporation whose principal place of business was in Van Nuys, California, at the time the petition was filed.

Petitioner was formed in 1948 by Robert Neiman (Mr. Neiman) and Robert Reed (Mr. Reed) as Neiman-Reed Lumber and Supply Co., Inc. Petitioner began operations as a wholesale lumber operation and expanded to include a chain of retail home and garden im-

---

[1] All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Except as noted, the record is unclear as to the timing of certain events. However, the inadequacy of the record in that respect does not affect our resolution of the issue presented.

provement stores. (We shall refer to retail home and garden improvement stores of the type operated by petitioner as home centers.) As of July 1981, Mr. Neiman, Mr. Reed, and Snider Lumber Products Co. (Snider Lumber) were equal stockholders of petitioner.

During July 1981, UBM Group PLC (UBM), a British company, purchased a 51-percent majority stock interest in petitioner and an option to purchase the remaining 49 percent of its stock that was owned one-third each by Mr. Neiman, Mr. Reed, and Snider Lumber. After UBM acquired 51 percent of petitioner's stock, Mr. Neiman was hired to serve as petitioner's chairman and CEO and Mr. Reed was hired to serve as petitioner's president and chief operating officer (COO).

Approximately four-and-a-half months after UBM acquired its majority stock interest in petitioner, Mr. Reed died after a massive heart attack and UBM's top management was forced out by its board of directors and replaced with a new management team. From that time until approximately April 1985, petitioner employed a number of different presidents hired by UBM and experienced many financial problems. During April 1985, UBM decided to sell its 51-percent stock interest in petitioner and not to exercise its option to purchase the remaining 49 percent of its stock.

During April 1985, pursuant to the terms of a redemption

agreement, petitioner redeemed UBM's 51-percent stock interest for a purchase price of $6,250,050, issued a note to UBM's parent corporation for that amount (UBM note), and retired the redeemed shares. As a result of that redemption, Mr. Neiman, Mr. Reed's estate and/or its beneficiaries,[3] and Snider Lumber (referred to collectively as the shareholders) each owned one-third of petitioner, and they were personally liable on the UBM note.

As of February 28, 1986, petitioner's liabilities exceeded it assets and its net worth was negative $1,514,000. According to its audited financial statement for its fiscal year ended February 28, 1986, that was prepared by Touche Ross & Co., petitioner's net income after taxes (but before utilization of net operating loss carryforwards/carrybacks) for that year was negative $3,599,000. During that fiscal year, petitioner's working capital decreased by $3,426,000 from $7,008,000 to $3,582,000 and its cash balance decreased by $1,410,000 from $2,815,000 to $1,405,000. Petitioner's long-term debt increased from $8,723,000 as of the end of its fiscal year ended February 28, 1984, to $13,092,000 as of the end of its fiscal year ended February 28, 1986. As of February 28, 1986, employee morale was

---

[3]  It is unclear from the record whether Mr. Reed's estate and/or its beneficiaries owned Mr. Reed's stock from the period beginning with Mr. Reed's death in 1981 until that stock was purchased (as discussed below) by Stanislaus Funding Corp. in December 1986. For convenience, we shall refer hereinafter to the owner of Mr. Reed's stock during that period as Mr. Reed's estate.

- 5 -

low as evidenced by the high rates of workmen's compensation claims and inventory shrinkage that most likely resulted from employee theft.  Petitioner was also experiencing increased competition around that time from the entry of large discount home centers into its market.

After petitioner redeemed UBM's shares during April 1985, petitioner's shareholders were interested in finding someone to manage petitioner's business and return it to profitability so that they could sell it.  Someone suggested to Mr. Neiman that he contact Jesse Ruf (Mr. Ruf), who had many years of experience in managing home centers.

During 1970, the president of W.E. Cooper Lumber Co. (Cooper Lumber) recruited Mr. Ruf to become its general merchandise manager.  At that time, Cooper Lumber, which owned two stores in Los Angeles, California, and was building a third, was in the process of shifting from a lumberyard to a home center business. Prior to Mr. Ruf's joining Cooper Lumber, its majority owner and leader, Bill Cooper, died, and that company was experiencing financial difficulties.  Upon joining Cooper Lumber, Mr. Ruf was responsible for marketing, merchandising, advertising, day-to-day operations, human resources, and finances.  He helped Cooper Lumber change its product mix by downplaying its lumberyard and increasing the variety of items it sold from 18,000 to 34,000. While he was employed by Cooper Lumber, sales increased from

$200,000 per month to approximately $500,000 per month.

During 1973, Lone Star Industries (Lone Star), which was then the largest producer of cement in the Western Hemisphere and which was looking to diversify itself, acquired Cooper Lumber and retained Mr. Ruf to manage that business. Upon joining Lone Star, Mr. Ruf held the title "sales manager" and eventually became president of its home center operations. After acquiring Cooper Lumber, Lone Star purchased a number of distressed companies in the lumberyard and home center businesses that achieved economic success under its management. Generally, the companies that Lone Star purchased were similarly situated to Cooper Lumber; that is to say, they were companies that were having difficulty changing from boom-market lumberyards to retail home centers. During 1979, Lone Star decided to sell its home center business to four different companies.

Instead of working for one of the companies that purchased Lone Star's home center business, during 1979, Mr. Ruf decided to acquire another distressed home center company, Sunset Builders Supply (Sunset). At that time, Sunset was operating three stores, one of which was located in Los Angeles and the other two of which were located in San Diego, California, and in Arizona. When Mr. Ruf became the owner of Sunset, he sold the two stores not located in Los Angeles and took over all responsibilities for the remaining store, including merchandising, day-to-day operations, and finances.

During March 1985, Mr. Neiman contacted Mr. Ruf.  For approximately one year thereafter, they discussed on several occasions the possibility of Mr. Ruf's becoming responsible for the management of petitioner.  Both Mr. Neiman and Mr. Ruf understood that Mr. Ruf would be interested in assuming that responsibility only if Mr. Ruf were given the option to purchase 100 percent of petitioner.  Acquiring such an option was Mr. Ruf's most important consideration in determining whether to agree to assume responsibility for the management of petitioner.

On April 1, 1986, petitioner entered into a management agreement (management agreement) with Mulholland Funding Corp. (MFC), which was owned by Mr. Ruf and his wife.  Pursuant to the management agreement, MFC agreed to provide petitioner with the management services of Mr. Ruf for the period that began on April 1, 1986, and terminated on March 31, 1989.[4]  In return, petitioner agreed to pay MFC fixed compensation of $8,000 per month plus additional compensation in the nature of an "operations bonus" to be determined at the end of each fiscal year for which the management agreement was in effect.  The operations bonus was to be calculated at the end of each fiscal year based on the following formula:  10 percent of the first $500,000 of petitioner's

_____

[4]  The parties stipulated that Mr. Ruf became employed by petitioner beginning in March 1986; however, the management agreement provided that neither MFC nor Mr. Ruf was to be considered an employee of petitioner.  We interpret the parties' stipulation to mean that, pursuant to the management agreement, Mr. Ruf became petitioner's CEO in March 1986.

net profit, 15 percent of the next $500,000 of its net profit, 20 percent of the next $1 million of its net profit, and 25 percent of its net profit in excess of $2 million.

Simultaneously with the execution of the management agreement, petitioner's shareholders and Mr. Ruf agreed that if Mr. Ruf were to achieve certain objectives with respect to petitioner, they would sell 100 percent of petitioner's stock to him.  On December 29, 1986, petitioner's shareholders and Mr. Ruf entered into a stock option agreement that is embodied in a document entitled "First Restatement of Stock Option Agreement" (stock option agreement) and that provided that Mr. Ruf or his assignee was entitled to purchase all of petitioner's stock.  On the same date, Mr. Ruf exercised that option through his wholly owned corporation, Stanislaus Funding Corp. (Stanislaus).  Stanislaus purchased 100 percent of petitioner's outstanding stock at that time.

The stock option agreement provided that the final purchase price for petitioner's stock was to be the sum of (1) 4.5 times petitioner's after-tax earnings for its fiscal year ended February 28, 1989, and (2) its book value (with certain adjustments) determined as of that date.  During November 1988, petitioner's former shareholders[5] and Mr. Ruf decided not to follow

_____

[5] For periods after petitioner's shareholders (viz., Mr. Neiman, Mr. Reed's estate, and Snider Lumber) sold their stock to Stanislaus in December 1986, we shall refer to them collectively
(continued...)

the formula prescribed in the stock option agreement for determining the final purchase price for petitioner and instead agreed on a final purchase price for petitioner of $2,045,520. After November 1988, the Ruf family trust owned 100 percent of petitioner's outstanding stock.[6]

At the time that the stock option agreement was exercised, Stanislaus issued petitioner's former shareholders notes in the total principal amount of $5,150,000 (original notes).[7] The original notes provided, inter alia, that Stanislaus was not to allow petitioner to:

> pay total compensation (including bonuses) or fees or make loan repayments or other distributions to Jesse Ruf or any affiliate thereof * * * that in the aggregate exceed $125,000 ("Base Amount") plus 10% of the first Five Hundred Thousand Dollars ($500,000) of net profits of Neiman-Reed * * *, 15% of the next Five Hundred Thousand Dollars ($500,000) of such net profits, 20% of the next One Million Dollars ($1,000,000) of such net profits, and 25% of the excess over Two Million Dollars ($2,000,000) of such net profits, but

---

[5](...continued)
as petitioner's former shareholders.

[6] Although the parties stipulated that the Ruf family trust owned 100 percent of petitioner's stock after November 1988, it is unclear when the Ruf family trust acquired that stock. Both parties refer to Mr. Ruf as the sole shareholder of petitioner throughout the years at issue. We presume that this is because he was in control of petitioner indirectly through the Ruf family trust. Since the parties refer to Mr. Ruf as petitioner's sole shareholder, we shall also refer to him herein as its sole shareholder.

[7] In addition, Stanislaus entered into a stock pledge agreement and an indemnity agreement, petitioner and MFC entered into a security agreement, and Mr. Ruf and his wife entered into a guaranty agreement.

> in no event shall distributions of such compensation, fees, repayments or distributions exceed $500,000 in the aggregate per fiscal year of Neiman-Reed; with any excess in earnings thereof accruing. * * *

At the time that Stanislaus purchased petitioner in December 1986, petitioner acquired MFC, and the management agreement between petitioner and MFC was terminated.

In November 1988, after Mr. Ruf and petitioner's former shareholders agreed on a final purchase price for petitioner's stock, replacement notes (replacement notes) that called for monthly principal payments of $200,000 and no interest payments were issued to those former shareholders in lieu of the original notes.[8]  During August 1988, the restrictions contained in the original notes on the amount of cash (whether as compensation or otherwise) that Mr. Ruf could withdraw from petitioner were terminated by agreement of petitioner's former shareholders.

Effective February 29, 1988, MFC and Stanislaus merged into petitioner, with petitioner as the surviving corporation of those mergers.  Mr. Ruf was the sole shareholder of Stanislaus prior to its merger into petitioner, and, according to the merger agreement between Stanislaus and petitioner, he was to be the sole shareholder of petitioner subsequent to that merger.

---

[8]  The details of those replacement notes are not clear from the record.

Mr. Ruf's Performance of Services for Petitioner[9]

When Mr. Ruf became responsible for petitioner's management in March 1986, he became petitioner's CEO and president. As such, he was responsible for all duties and functions relating to petitioner's management and operations, including day-to-day operations, marketing, human resources, merchandising, advertising, check writing, accounts receivables, relations with suppliers and noteholders, and real estate negotiations. For at least the first two or three years after he became petitioner's CEO, Mr. Ruf worked 12 to 15 hours a day, six to seven days a week. With the exception of one employee who was made an officer for the sole purpose of acting on petitioner's behalf in small claims court and Mr. Lyons who became petitioner's chief financial officer (CFO) in either March 1989 or March 1990,[10] Mr. Ruf was petitioner's only officer. Beginning at least as early as March 1987 and continuing throughout the years at issue, Mr. Ruf was the sole member of petitioner's board of directors.

---

[9] The record is unclear as to when certain services were performed by Mr. Ruf for petitioner. However, the record indicates that many of the results of Mr. Ruf's services first appeared during petitioner's fiscal year ended Feb. 28, 1987, and that Mr. Ruf continued to provide extensive services to petitioner throughout the years at issue. Unless otherwise indicated, our discussion herein relating to Mr. Ruf's performance of services for petitioner relates to the period that started in March 1986 when Mr. Ruf became petitioner's CEO and ended on Feb. 28, 1991.

[10] The record is unclear as to the year in which Mr. Lyons became CFO.

After becoming petitioner's CEO in March 1986, Mr. Ruf improved petitioner's relationship with its suppliers. At the time Mr. Ruf became petitioner's CEO, petitioner was not paying its suppliers and other creditors because it did not have enough cash, and its creditors were discussing the possibility of forming a creditors' committee to force petitioner into bankruptcy. Shortly after becoming petitioner's CEO in March 1986, Mr. Ruf negotiated with petitioner's suppliers to extend its credit for an additional 30 days even though petitioner had not paid them for previously shipped items. Those suppliers agreed to extend petitioner's credit at least in part due to Mr. Ruf's reputation in the industry for turning around troubled home centers. In addition, Mr. Ruf increased the communication between petitioner and its suppliers.

In an attempt to improve employee morale, Mr. Ruf started a policy of having 7 a.m. meetings with petitioner's store employees. The meetings were known as "donuts with Jess". In addition, during petitioner's fiscal year ended February 29, 1988, Mr. Ruf authorized on behalf of petitioner an $800,000 contribution to petitioner's employee profit-sharing plan. Mr. Ruf also changed petitioner's hiring policies and started to require preemployment physicals and drug tests. As employee morale improved, petitioner suffered fewer workmen's compensation claims and less inventory shrinkage.

Shortly after becoming petitioner's CEO, Mr. Ruf undertook a study of petitioner's inventory. In connection with that study, he temporarily stopped all buying for petitioner's stores and systematically determined what items of inventory it would discontinue selling. He decided to eliminate pet food, televisions, video-cassette recorders, and automotive parts. In order to obtain cash for petitioner, he started conducting sidewalk sales to sell its unwanted inventory. Within approximately 90 days after Mr. Ruf became petitioner's CEO, its inventory was reduced by approximately $2 million.

Shortly after becoming petitioner's CEO in March 1986, Mr. Ruf made a number of changes in the management and administrative structure of petitioner. Mr. Neiman was named chairman of its board of directors and relieved of responsibility as its CEO. Mr. Ruf also terminated petitioner's president, CFO, director of merchandise, director of personnel, and director of operations. In addition to terminating petitioner's top management, Mr. Ruf also discharged, inter alia, its director of real estate, director of finance/controller, field merchandising manager, director of advertising, and director of security. He also reduced the number of buyers for petitioner from seven to four. As a result of Mr. Ruf's efforts, in approximately three to six months after Mr. Ruf became petitioner's CEO, petitioner's office staff was cut in half from approximately 120 employees to approximately 60 employees.

Within one year of becoming petitioner's CEO, Mr. Ruf negotiated releases from the leases for three of petitioner's stores that were adversely affecting its profits and closed those stores. Mr. Ruf also renegotiated the leases for petitioner's remaining stores, most of which were with the former shareholders. Those leases were changed from percentage leases, where the amount of the rent increased as the sales volume increased, to fixed-rent leases. Mr. Ruf purchased an interest in at least one of the stores leased by petitioner.

In addition to renegotiating petitioner's leases, within two years after becoming petitioner's CEO, Mr. Ruf also negotiated a $250,000 reduction in the amount owed by petitioner under the UBM note. The UBM note was subsequently purchased by the former shareholders and Mr. Ruf.[11]

As petitioner's CEO, Mr. Ruf changed petitioner's retail marketing strategy. In order to compete with the large discount home centers that had entered petitioner's market, Mr. Ruf decided that petitioner needed to provide better customer service and make its stores more convenient to the customers. He attempted to make petitioner's stores attractive and clean places in which to shop. He changed petitioner's tradename to Lumber City, The City of Home Improvement. Along with the change in

---

[11] The precise portion of the UBM note owned by each of the former shareholders and Mr. Ruf is unclear, although Mr. Ruf purchased only a "small piece" of it.

petitioner's tradename, Mr. Ruf designed, inter alia, the interiors of its stores to replicate stores within a city.  For example, all of the different departments in its stores were given personalized names such as Joe's Hardware and Sally's Seasonal, and all the aisles in the stores were given street names, rather than numbers.  Rather than lowering prices, Mr. Ruf increased petitioner's profit margins by, inter alia, increasing petitioner's inventory turnover rate, sales per store, and sales per employee.

Mr. Ruf also changed petitioner's method of advertising.  Prior to Mr. Ruf's becoming petitioner's CEO, petitioner used electronic media advertising.  That type of advertising was expensive and was sent to areas outside of the areas in which petitioner's customers primarily resided.  Under Mr. Ruf's direction, petitioner started utilizing print advertising such as weekly newspaper advertisements.

In addition to the extensive changes Mr. Ruf instituted with respect to petitioner's home centers, Mr. Ruf changed the focus of petitioner's wholesale lumber business from supplying petitioner's internal needs to supplying outside customers.  As a result, petitioner became the largest supplier of lumber to the movie studios in southern California, the largest supplier of all vertical-grain Douglas fir to sash and door manufacturers, and the largest industrial wholesaler of upper-grade pine in the United States.

Ed Langley (Mr. Langley) was the manager of the wholesale lumber business from the time Mr. Ruf became petitioner's CEO in March 1986 and throughout the years at issue; however, he was never an officer of petitioner during that period. During the years at issue, Mr. Langley talked with Mr. Ruf on the telephone daily and met with him approximately once a week. They discussed, inter alia, recruiting high caliber employees, raising petitioner's credit standards for sales to outside customers, and training petitioner's sales personnel to solicit customers.

Compensation

Petitioner paid Mr. Ruf the following amounts of compensation during, and deducted those amounts in its Federal income tax returns for, the years indicated:[12]

| Year Ended | Total Compensation Paid |
|---|---|
| Feb. 28, 1987 | $80,000 |
| Feb. 29, 1988 | 132,629 |
| Feb. 28, 1989 | 1,454,746 |
| Feb. 28, 1990 | 2,600,000 |
| Feb. 28, 1991 | 750,000 |

In its financial statements, petitioner expensed the following amounts of compensation that it had accrued with respect to Mr.

---

[12]  In the first supplemental stipulation of facts, the parties rounded the amounts of compensation petitioner deducted in its Federal income tax returns and expensed in its financial statements for the relevant years. However, the record establishes the exact amounts of such compensation, and we shall use herein those exact amounts.

Ruf for the years indicated:[13]

| Year Ended | Total Compensation Accrued |
|------------|----------------------------|
| Feb. 28, 1987 | $395,603 |
| Feb. 29, 1988 | 1,003,629 |
| Feb. 28, 1989 | 132,693 |
| Feb. 28, 1990 | 2,600,000 |
| Feb. 28, 1991 | 750,000 |

The $80,000 in cash compensation petitioner paid to Mr. Ruf during its fiscal year ended February 28, 1987, represented (1) $60,000 in compensation that was earned pursuant to the management agreement between MFC and petitioner and (2) $20,000 in compensation that was earned by Mr. Ruf in his individual capacity after that management agreement was terminated in December 1986 when Stanislaus purchased petitioner.

The $132,629 in cash compensation petitioner paid to Mr. Ruf during its fiscal year ended February 29, 1988, represented his base salary for that year.

The $1,454,746 in cash compensation petitioner paid to Mr. Ruf during its fiscal year ended February 28, 1989, represented four components: (1) His base salary for that year of $132,693,

---

[13] Petitioner's financial statements for its fiscal years ended Feb. 29, 1984, and Feb. 28, 1985, were audited by Peat, Marwick, Mitchell & Co. Its financial statements for its fiscal year ended Feb. 28, 1986, for the period Dec. 29, 1986 (the date of the acquisition of petitioner by Stanislaus) through Feb. 28, 1987, and its fiscal year ended Feb. 29, 1988, were audited by Touche Ross & Co. No financial statement was prepared for the period Mar. 1, 1986, through Dec. 28, 1986. Petitioner's financial statements for its fiscal years ended Feb. 28, 1989, Feb. 28, 1990, and Feb. 28, 1991, were not audited by an independent certified public accountant.

(2) $315,603 that was awarded pursuant to the management agreement for the period April 1, 1986, through December 1986, (3) $933,333 that was awarded pursuant to a deferred compensation arrangement adopted on March 20, 1987, by Mr. Ruf as the sole director of petitioner's board of directors (1987 deferred compensation arrangement), and (4) $73,117 of interest on the $315,603 awarded pursuant to the management agreement.

The 1987 deferred compensation arrangement provided in pertinent part:

> WHEREAS, Jesse Ruf, as this Corporations's president and chief operating officer,[14] has been required and continues to be required to render services substantially in excess of those which would ordinarily be required in connection with his office due to the condition of the Corporation's business at the time of his employment and the need to render extraordinary efforts to prevent the Corproation [sic] from failing; and

> WHEREAS, Jesse Ruf has, in his capacity as president and chief operating officer, provided extraordinary leadership and ability as evidenced by the Corporation's current operating profits and steadily improving financial position;

> NOW, THEREFORE, BE IT RESOLVED, that a special deferred compensation arrangement is hereby awarded to Jesse Ruf in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.) to be accrued in three (3) equal installments of Five Hundred Thousand Dollars ($500,000.) each during this Corporation's fiscal years 1988, 1989 and 1990, the amount so accrued shall [sic] be payable by the Corporation in all events provided only that Jesse Ruf shall complete twelve (12) calendar months of employment during each such corporate year. * * *

---

14 Although the 1987 deferred compensation arrangement provided that Mr. Ruf was serving as petitioner's president and COO, he was also serving as petitioner's CEO at that time. As CEO, he assumed responsibility for all of petitioner's operations, including acting as COO.

The 1987 deferred compensation arrangement was terminated as of January 31, 1989.  In its audited financial statement for its fiscal year ended February 29, 1988, petitioner expensed $871,000 in deferred compensation with respect to the 1987 deferred compensation arrangement.  That expense was the only expense reflected in its financial statements for the years at issue with respect to that arrangement.  During petitioner's fiscal year ended February 28, 1989, petitioner paid $933,333 to Mr. Ruf pursuant to the 1987 deferred compensation arrangement.[15]

Petitioner did not pay Mr. Ruf a base salary in either of its fiscal years ended February 28, 1990, or February 28, 1991. The $2,600,000 of compensation petitioner deducted in its Federal income tax return for its taxable year ended February 28, 1990, was not paid to Mr. Ruf pursuant to a plan.

Petitioner's Financial Results

According to its financial statements, petitioner had the following sales, net income after taxes (but before utilization of net operating loss carryforwards/carrybacks), and shareholder's equity for the years indicated:

---

[15]  The record does not explain how petitioner calculated the $871,000 it expensed in its financial statement for its fiscal year ended Feb. 29, 1988, with respect to the 1987 deferred compensation arrangement or the $933,333 it paid to Mr. Ruf during its fiscal year ended Feb. 28, 1989, with respect to that arrangement.

| Year Ended | Sales | Net Income After Taxes | Shareholder's Equity[16] |
|---|---|---|---|
| Feb. 28, 1986 | $61,499,000 | ($3,599,000) | ($1,514,000) |
| Feb. 28, 1987[17] | -- | -- | 2,641,000 |
| Feb. 29, 1988 | 55,510,000 | 413,000 | 512,000 |
| Feb. 28, 1989 | 57,672,000 | 390,000 | 1,129,000 |
| Feb. 28, 1990 | 60,960,000 | 325,000 | 1,454,000 |
| Feb. 28, 1991 | 56,884,000 | 275,000 | 1,729,000 |

According to its Federal income tax returns, petitioner had the following sales, net income after taxes (but before utilization of net operating loss carryforwards/carrybacks), and shareholder's equity for the years indicated:

---

[16] The shareholder's equity in petitioner as shown in its partial-year financial statement for the period Dec. 29, 1986, through Feb. 28, 1987, and in its Federal income tax return for its taxable year ended Feb. 28, 1987, reflected the purchase of petitioner by Stanislaus. That purchase was reflected at $2,500,000 and caused an increase in petitioner's shareholder's equity by that amount. When Stanislaus was merged into petitioner at the end of February 1988, the transaction was reversed, and petitioner's shareholder's equity was reduced by a corresponding amount. That reversal is reflected in petitioner's financial statement for its fiscal year ended Feb. 29, 1988, and in its tax return for its taxable year ended Feb. 28, 1989.

[17] Because only a partial-year financial statement was prepared for petitioner's fiscal year ended Feb. 28, 1987, petitioner's sales and net income data for that year are unavailable. However, the parties stipulated to the use of the sales and net income amounts reported in petitioner's Federal income tax return for its taxable year ended Feb. 28, 1987, as the sales and net income amounts for petitioner's financial statement for its fiscal year ended Feb. 28, 1987. Accordingly, when referring herein to petitioner's financial statement for its fiscal year ended Feb. 28, 1987, we shall use petitioner's sales of $58,515,000 and net income of $823,000 as reported in its Federal income tax return for that year in lieu of the actual financial statement sales and net income data for that year.

| Year Ended | Sales | Net Income After Taxes | Shareholder's Equity |
|------------|-------|------------------------|----------------------|
| Feb. 28, 1986 | $61,499,000 | ($3,591,000) | ($1,489,000) |
| Feb. 28, 1987 | 58,515,000 | 823,000 | 2,848,000 |
| Feb. 29, 1988 | 53,854,000 | 1,561,000 | 4,082,000 |
| Feb. 28, 1989 | 57,672,000 | (504,000) | 1,037,000 |
| Feb. 28, 1990 | 60,960,000 | (71,000) | 1,212,000 |
| Feb. 28, 1991 | 56,883,000 | 362,000 | 1,508,000 |

## Mr. Ruf's Loans to Petitioner

At approximately the same time that petitioner paid $1,454,746 to Mr. Ruf during its fiscal year ended February 28, 1989, Mr. Ruf lent petitioner approximately $925,000. At approximately the same time that petitioner paid $2,600,000 to Mr. Ruf during its fiscal year ended February 28, 1990, Mr. Ruf lent petitioner approximately $2 million.

## Mr. Neiman

Throughout the years at issue, Mr. Neiman owned interests in the original notes and the replacement notes issued in connection with the sale of petitioner's stock to Mr. Ruf and the UBM note that the former shareholders and Mr. Ruf purchased. Until January 1988, Mr. Neiman remained on petitioner's payroll and retained an office next to Mr. Ruf's office. After January 1988, Mr. Neiman decided that he no longer wanted to be on petitioner's payroll; nonetheless, throughout the remaining years at issue, Mr. Ruf allowed Mr. Neiman to use one of petitioner's offices. Prior to, during, and after the years at issue, Mr. Neiman re-

ceived and reviewed petitioner's financial statements and had regular discussions with Mr. Ruf concerning petitioner. At no time during those years did Mr. Neiman disapprove the compensation petitioner paid to Mr. Ruf. Although the original notes initially restricted the amount of cash that Mr. Ruf was allowed to withdraw from petitioner due to its poor cash position, Mr. Neiman expected that Mr. Ruf would be justly compensated as soon as the cash was available to do so.

Notice of Deficiency

In the notice of deficiency (notice), respondent allowed the entire amount of $132,629 that petitioner deducted as compensation paid to Mr. Ruf in its Federal income tax return for its taxable year ended February 29, 1988, and disallowed $1,322,053, $2,600,000, and $750,000 of the amounts that petitioner deducted as compensation paid to Mr. Ruf in its Federal income tax returns for its taxable years ended February 28, 1989, February 28, 1990, and February 28, 1991, respectively. Respondent thus determined that petitioner was entitled to deduct as compensation paid to Mr. Ruf $132,629 for its taxable year ended February 29, 1988, $132,693 for its taxable year ended February 28, 1989, and $0 for its taxable years ended February 28, 1990, and February 28, 1991.

## OPINION[18]

Section 162(a)(1) allows a corporation to deduct as a business expense "a reasonable allowance for salaries or other compensation for personal services actually rendered".  A corporation may be entitled to deduct compensation for the year during which such compensation is paid to an employee, even though the employee performed the services for which he or she is being compensated in a prior year.  Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930).  To be deductible, however, the corporation must show:  (1) That the corporation intended to compensate the employee for past undercompensation and (2) the amount of the past undercompensation.  Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Estate of Wallace v. Commissioner, 95 T.C. 525, 553-554 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).

Section 1.162-7(a), Income Tax Regs., establishes "a two-prong test for deductibility under section 162(a)(1):  (1) the amount of the compensation must be reasonable and (2) the payments must in fact be purely for services."  Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and

---

[18]  We have considered all of the arguments made by the parties and, to the extent not discussed herein, have found them to be without merit.

remanding T.C. Memo. 1980-282.  Since proof of the second prong (viz., compensatory purpose) can be difficult to establish and a compensatory purpose can often be inferred if the amount of the compensation is determined to be reasonable under the first prong, "courts generally concentrate on the first prong--whether the amount of the purported compensation is reasonable."  Id. What constitutes reasonable compensation is a question of fact that must be determined in light of all of the evidence.  Pacific Grains, Inc. v. Commissioner, supra at 605.

Many factors are relevant in determining the reasonableness of compensation, and no single factor is decisive.  Elliotts, Inc. v. Commissioner, supra at 1245; Pacific Grains, Inc. v. Commissioner, supra at 606.  The U.S. Court of Appeals for the Ninth Circuit (Court of Appeals) to which an appeal in this case would normally lie has divided those factors into five broad categories:  (1) The employee's role in the company, (2) a comparison of the compensation paid to the employee with the compensation paid to similarly situated employees in similar companies, (3) the character and condition of the company, (4) whether a conflict of interest exists that might allow the company to disguise dividend payments as deductible compensation, and (5) whether the compensation was paid pursuant to a structured, formal, and consistently applied program.  Elliotts, Inc. v. Commissioner, supra at 1245-1248.

Petitioner bears the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). If petitioner shows error in respondent's determinations, the Court must decide the amount of compensation that was reasonable based on the entire record before us. Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564, 568 (1974), affd. 528 F.2d 176 (10th Cir. 1975).

In the notice, respondent allowed the entire amount of $132,629 that petitioner deducted as compensation paid to Mr. Ruf in its Federal income tax return for its taxable year ended February 29, 1988, and disallowed all but $132,693 of the amount petitioner deducted as compensation paid to Mr. Ruf for its taxable year ended February 28, 1989, and all of the amounts petitioner deducted as compensation paid to Mr. Ruf for its taxable years ended February 28, 1990, and February 28, 1991. At trial and on brief, respondent concedes that petitioner is entitled to deduct all of the amounts it claimed as compensation paid to Mr. Ruf for the last three years at issue except for $2,100,000 of the $2,600,000 claimed for its taxable year ended February 28, 1990. Accordingly, we must decide on the basis of the record before us whether petitioner is entitled to deduct for that year an amount of compensation to Mr. Ruf in excess of that conceded by respondent.

Petitioner argues that the entire amount of compensation (viz., $2,600,000) it paid to Mr. Ruf during, and deducted for, its taxable year ended February 28, 1990, was reasonable. Of that total amount, petitioner contends that $800,000 represented compensation to Mr. Ruf for services he provided during its fiscal year ended February 29, 1988, $800,000 represented compensation to Mr. Ruf for services he provided during its fiscal year ended February 28, 1989, and $1 million represented compensation to Mr. Ruf for services he provided during its fiscal year ended February 28, 1990.

As part of its argument that the compensation paid Mr. Ruf during its fiscal year ended February 28, 1990, was attributable in part to services he provided during its fiscal years ended February 29, 1988, and February 28, 1989, petitioner contends that the $933,333 in compensation paid to Mr. Ruf during its fiscal year ended February 28, 1989, pursuant to the 1987 deferred compensation arrangement was awarded as compensation to Mr. Ruf for services rendered during its fiscal year ended February 28, 1987. Thus, according to petitioner, it awarded the following amounts of compensation to Mr. Ruf for the years indicated, and those amounts are reasonable:

| Year Ended | Compensation |
|------------|--------------|
| Feb. 28, 1987 | $1,328,936 |
| Feb. 29, 1988 | 933,000 |

|              |           |
|--------------|-----------|
| Feb. 28, 1989 | 933,000   |
| Feb. 28, 1990 | 1,000,000 |
| Feb. 28, 1991 | 750,000   |

Respondent counters that Mr. Ruf earned the $933,333 in compensation petitioner paid him pursuant to the 1987 deferred compensation arrangement during the years for which it was to accrue under that arrangement,[19] that Mr. Ruf was not undercompensated for any years prior to petitioner's fiscal year ended February 28, 1990, and that petitioner is entitled to deduct only $500,000 as reasonable compensation to Mr. Ruf for its taxable year ended February 28, 1990.  Thus, according to respondent, petitioner awarded the following amounts of compensation to Mr. Ruf for the indicated years, and only those amounts are reasonable:

| Year Ended     | Compensation |
|----------------|--------------|
| Feb. 28, 1987  | $395,603     |
| Feb. 29, 1988  | 565,629      |
| Feb. 28, 1989  | 632,693      |
| Feb. 28, 1990  | 500,000      |
| Feb. 28, 1991  | 750,000      |

---

[19]  Respondent contends that, of the $933,000 that petitioner paid Mr. Ruf pursuant to the 1987 deferred compensation arrangement, $433,000 was to accrue for petitioner's fiscal year ended Feb. 29, 1988, and $500,000 was to accrue for its fiscal year ended Feb. 28, 1989.  It appears to us that the respective amounts that respondent contends were to accrue for those years pursuant to the 1987 deferred compensation arrangement should be reversed (i.e., it appears that $500,000 was to accrue for petitioner's fiscal year ended Feb. 29, 1988, and $433,000 was to accrue for its fiscal year ended Feb. 28, 1989).

We disagree with the various contentions of both parties. However, we believe that petitioner's positions regarding the fiscal years for which it paid the compensation accrued under the 1987 deferred compensation arrangement and for which it paid the compensation during its fiscal year ended February 28, 1990, are more consistent with the record herein than are respondent's positions concerning those matters.

Specifically, based on our examination of the entire record before us, we find that petitioner awarded most of the $933,333 it paid to Mr. Ruf pursuant to the 1987 deferred compensation arrangement as compensation for services he performed during its fiscal year ended February 28, 1987, and the balance of that amount as compensation for services he provided during its fiscal years ended February 29, 1988, and February 28, 1989. The 1987 deferred compensation arrangement provided in pertinent part that Mr. Ruf "has been required and continues to be required to render services substantially in excess of those which would ordinarily be required" and "has, in his capacity as president and chief operating officer, provided extraordinary leadership and ability as evidenced by the Corporation's [petitioner's] current operating profits and steadily improving financial position". That petitioner awarded substantial additional compensation to Mr. Ruf for services he provided during its fiscal year ended February

28, 1987, is entirely reasonable given the magnitude of the turn-around he thereby achieved for petitioner during that year.[20] It also is entirely reasonable that petitioner desired to sustain its turnaround and attempted to maximize its chances of doing so by requiring Mr. Ruf to continue to provide services to it during the three fiscal years following its fiscal year ended February 28, 1987.[21]

We further find, based on our examination of the entire record before us (including the testimony of Mr. Lyons and Mr. Ruf, both of whom we found credible on this issue), that peti-

---

[20] On the present record, we reject respondent's contention that Mr. Ruf was not undercompensated during petitioner's fiscal year ended Feb. 28, 1987, because he received an option to purchase petitioner's stock. Respondent did not determine that the receipt of that option resulted in taxable compensation to Mr. Ruf. Nor did she present any evidence to show that the purchase price paid for all of petitioner's stock was less than the fair market value of that stock. Although the stock option was offered to Mr. Ruf in an effort to cause him to decide to join petitioner, it does not necessarily follow that the amount of reasonable compensation that petitioner may deduct for Mr. Ruf's services during its taxable year ended Feb. 28, 1987, is affected by Mr. Ruf's receipt of that option.

[21] On the instant record, we reject respondent's contention that, because the $1,500,000 of compensation that petitioner was to accrue under the 1987 deferred compensation arrangement in equal installments of $500,000 for each of its fiscal years ended Feb. 29, 1988, Feb. 28, 1989, and Feb. 28, 1990, was payable "provided only that Jesse Ruf shall complete twelve (12) calendar months of employment during each" of such fiscal years, petition-er awarded the $933,333 of compensation it paid under that arrangement exclusively for services Mr. Ruf provided during its fiscal years ended Feb. 29, 1988, and Feb. 28, 1989.

tioner intended to compensate Mr. Ruf for services he performed for it during its fiscal years ended February 29, 1988, February 28, 1989, and February 28, 1990, when it paid him $2,600,000 in compensation during its fiscal year ended February 28, 1990.

We shall now analyze and apply herein the relevant factors identified by the Court of Appeals to determine reasonable compensation within the meaning of section 162(a)(1).

Role in Company

The first category of factors identified by the Court of Appeals is the role in the company of the employee whose compensation is at issue. Relevant considerations include the employee's qualifications, position, hours worked, duties performed, and general importance to the company's success. Elliotts, Inc. v. Commissioner, 716 F.2d at 1245-1246.

There is little doubt that Mr. Ruf played a significant role in returning petitioner to profitability. At the time Mr. Ruf became petitioner's CEO in March 1986, petitioner was on the verge of bankruptcy and was not paying its suppliers and other creditors because it did not have enough cash. As of February 28, 1986, petitioner's net worth was negative $1,514,000. According to its audited financial statement for its fiscal year ended February 28, 1986, petitioner's net income after taxes (but before utilization of net operating loss carryforwards/carry-

backs) for that year was negative $3,599,000. In addition, at the time that Mr. Ruf became petitioner's CEO, petitioner was facing increased competition from the entry of large discount home centers into its market. Despite that competition, under Mr. Ruf's direction, petitioner achieved, according to its financial statements, a positive net income after taxes (but before utilization of net operating loss carryforwards/carrybacks) for each of its fiscal years ended February 28, 1987, through February 28, 1991.

After Mr. Ruf became petitioner's CEO in March 1986, he undertook a number of initiatives in order to return petitioner to profitability. Shortly after becoming petitioner's CEO, he negotiated with petitioner's suppliers to extend petitioner's credit even though petitioner had not been paying its bills. Petitioner's suppliers extended petitioner's credit in part because of Mr. Ruf's reputation in the industry for turning around troubled home centers.

To improve employee morale, Mr. Ruf started having 7 a.m. "donuts with Jess" meetings with petitioner's store employees. As a result of his efforts, employee morale improved as evidenced by fewer workmen's compensation claims and reduced inventory shrinkage.

Within approximately three to six months after becoming petitioner's CEO, Mr. Ruf reduced petitioner's office staff by

approximately 50 percent and fired virtually all of petitioner's top management personnel. Instead of replacing those management employees, Mr. Ruf himself assumed their responsibilities and performed their functions. As petitioner's CEO and president, he was responsible for its management and operations, including its day-to-day operations, marketing, human resources, merchandising, advertising, check writing, accounts receivables, relations with suppliers and noteholders, and real estate negotiations. During at least the first two or three years after he became petitioner's CEO, Mr. Ruf worked 12 to 15 hours a day, six to seven days a week. With the exception of one employee who was made an officer for the sole purpose of acting on petitioner's behalf in small claims court and Mr. Lyons who became petitioner's CFO in either March 1989 or March 1990, Mr. Ruf was petitioner's only officer during the years at issue.

After he became petitioner's CEO, Mr. Ruf was responsible for changing petitioner's retail marketing strategy so that it could compete effectively with the large discount home centers that had entered its market. Rather than trying to compete with those companies on price, Mr. Ruf decided that petitioner needed to provide better customer service. In that respect, he (1) changed petitioner's tradename to Lumber City, The City of Home Improvement, (2) changed the interior design of petitioner's stores to resemble stores within a city, and (3) made peti-

tioner's stores attractive and clean places in which to shop. Rather than lowering prices, he increased petitioner's profit margins by, inter alia, increasing petitioner's inventory turnover rate, sales per stores, and sales per employee.

Not only did Mr. Ruf refocus petitioner's retail stores, he also refocused its wholesale lumber business. Prior to his becoming petitioner's CEO, petitioner's wholesale lumber business was primarily dependent on internal sales to its retail home center stores. Under Mr. Ruf's direction, the wholesale lumber business focused on selling lumber to third parties. As a result of those efforts, petitioner became the largest supplier of lumber to the movie studios in southern California, the largest supplier of all vertical-grain Douglas fir to sash and door manufacturers, and the largest industrial wholesaler of upper-grade pine in the United States.

External Comparison

The second category of relevant factors identified by the Court of Appeals is a comparison of the employee's compensation with that paid by similar companies in similar industries for similar services. Elliotts, Inc. v. Commissioner, supra at 1246; see sec. 1.162-7(b)(3), Income Tax Regs.

For purposes of making external comparisons, both parties rely on the opinions of experts. We evaluate the opinions of an expert in light of such expert's qualifications and all other

evidence in the record. See Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 561 (1986). We have broad discretion to evaluate the overall cogency of an expert's analysis. Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986)), affg. in part and revg. in part on another issue T.C. Memo. 1986-318. We are not bound by the formulae and opinions proffered by an expert, especially when they are contrary to our own judgment. Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139. Instead, we may reach a decision based on our own analysis of all the evidence in the record. Silverman v. Commissioner, supra at 933. The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based. See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244. While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, supra at 562. We may

also reject the opinion of an expert witness in its entirety. Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Parker v. Commissioner, supra at 562-565.

Respondent relies on the opinions of E. James Brennan III (Mr. Brennan), the president of a personnel and pay practice consulting firm. Using statistical analyses that compared the ratios of CEO compensation to total sales based on survey data collected by the Wyatt Executive Compensation Service (ECS), Mr. Brennan concluded that the following is the highest maximum compensation to which Mr. Ruf was entitled for each of the years indicated:

| Year Ended | Maximum Compensation |
|---|---|
| Feb. 28, 1989 | $389,760 |
| Feb. 28, 1990 | 368,190 |
| Feb. 28, 1991 | 914,490 |

We are unwilling to rely on Mr. Brennan's analyses or his opinions. One of the principal problems we have with his analyses is that we are not persuaded that the ECS survey data on which they were based are data obtained from companies that are comparable to petitioner. For example, Mr. Brennan used data he obtained from the broad category of retail trade, rather than a narrower category of retail home centers. In fact, there is no evidence that a single home center was included in the survey data on which Mr. Brennan relied. Moreover, although petitioner

had annual sales of only approximately $60 million during the relevant years, it does not appear that any company included in the ECS survey data had annual sales of less than $150 million.[22]

Petitioner relies on the opinions of Bruce W. Barren, Ph.D. (Dr. Barren), the chairman of an international merchant banking firm, and Joseph D. Vinso, Ph.D. (Dr. Vinso), the president of a business valuation and consulting firm. We are unwilling to rely on the analyses or opinions of either of petitioner's experts.

In his expert report, Dr. Barren analyzed the various factors outlined by the Court of Appeals in Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (9th Cir. 1983), and concluded that the compensation paid to Mr. Ruf was reasonable. Dr. Vinso also applied the factors identified by the Court of Appeals in the Elliotts case and expressed his opinion as to whether the weight of those factors shows that the compensation paid by petitioner to Mr. Ruf was reasonable. That is not the role of an expert, see Marx & Co. v. Diners' Club Inc., 550 F.2d 505, 508-511 (2d

---

[22] Although Mr. Brennan conducted a telephone survey to determine the accuracy of his results, we did not find the telephone survey to be reliable or probative of comparable compensation. In conducting his telephone survey, Mr. Brennan simply inquired whether any of the companies he called paid their respective CEOs compensation in excess of $500,000. However, there was no discussion during those telephone discussions of what constituted compensation or whether the work performed by the CEO of each of those companies was comparable to the work performed by Mr. Ruf. Nor does the record establish that the companies Mr. Brennan surveyed by telephone were totally candid and forthcoming about information relating to their respective CEOs' compensation.

Cir. 1977); <u>Garnac Grain Co. v. Commissioner</u>, 95 T.C. 7, 26-27 (1990), and we do not rely on the respective opinions of Dr. Barren and Dr. Vinso concerning such matters.

With respect to Dr. Barren, we found him to be evasive at times when questioned on cross-examination. For example, he was unwilling to give his opinion on cross-examination of the maximum amount of Mr. Ruf's compensation for the years at issue that he considered reasonable. In addition, we found Dr. Barren's analyses to be flawed in a number of respects. By way of illustration, when Dr. Barren analyzed the compensation paid by each company that he found to be comparable to petitioner, he concluded that Mr. Ruf was entitled to compensation that was equal to the total officer compensation, rather than just the CEO compensation, paid by each such allegedly comparable company. However, he failed to compare the roles undertaken by all the officers at each of those allegedly comparable companies with the roles undertaken by Mr. Ruf at petitioner. Thus, we are not persuaded that Mr. Ruf is entitled to the compensation of all the officers of any of those allegedly comparable companies.

With respect to Dr. Vinso, we found his testimony to be at times contradictory and evasive. For example, when asked on cross-examination, Dr. Vinso was unwilling to say whether or not there was a statistical correlation between a company's asset size and the ratio of its officer compensation to its sales. In

addition, we found his analyses to be flawed in certain respects. By way of illustration, like Mr. Brennan, Dr. Vinso used statistical analyses of the ratios of officer compensation to sales based on survey data to compute the amount of compensation to which Mr. Ruf was entitled. Rather than utilizing the ECS survey data on which Mr. Brennan relied, Dr. Vinso relied on survey data collected by Robert Morris Associates (RMA). As was true of the ECS survey data Mr. Brennan used, the RMA survey data Dr. Vinso used appears to have been obtained from companies that were not comparable to petitioner. At trial, Dr. Vinso admitted that, because no information was provided in the RMA survey data for the asset range that included petitioner (i.e., $10 million to $50 million), he used the ratios that were derived from companies with assets ranging from $1 million to $10 million.[23]

In summary, we have not found the analyses performed or the opinions expressed by any of the experts upon whom the parties rely to be persuasive or reliable. We are unwilling to accept their respective opinions regarding Mr. Ruf's compensation during the years at issue.

Character and Condition of the Company

The third category of factors identified by the Court of

---

[23] We also note that some of the criticisms that Dr. Barren expressed during his testimony concerning Mr. Brennan's use of survey data to calculate reasonable compensation apply equally to Dr. Vinso's use of survey data for that purpose.

Appeals concerns the character and condition of the company.  The relevant factors include the company's size as shown by its sales, net income or capital value, and the complexities of the business and general economic conditions.  Elliotts, Inc. v. Commissioner, supra at 1246.

Petitioner has demonstrated that prior to and during the years at issue it was engaged in a very competitive and complex business.  Prior to Mr. Ruf's arrival, petitioner was on the verge of bankruptcy and was facing increased competition from the entry of large discount home centers into its market.  Although petitioner was on the verge of bankruptcy prior to Mr. Ruf's becoming its CEO and, according to its financial statement, had net income after taxes (but before utilization of net operating loss carryforwards/carrybacks) for its fiscal year ended February 28, 1986, of negative $3,599,000, its financial statements show that it had a net profit after taxes (but before utilization of net operating loss carryforwards/carrybacks) for its fiscal years ended February 28, 1987, February 29, 1988, February 28, 1989, February 28, 1990, and February 28, 1991, of $823,000, $413,000, $390,000, $325,000, and $275,000, respectively.  Under Mr. Ruf's direction, petitioner made a significant turnaround and returned to profitability.

Although petitioner's financial statements show that it had a positive net profit after taxes (but before utilization of net

operating loss carryforwards/carrybacks) for each of its five fiscal years that commenced with its fiscal year ended February 28, 1987, at the beginning of which Mr. Ruf became its CEO, respondent notes that those net profits declined for each such successive year. She argues that such a pattern of declining net profits is a factor that should significantly reduce the amount of Mr. Ruf's compensation that is considered reasonable for each such year. Respondent's argument fails to take into account that the decline in petitioner's net profits as reflected in its financial statements for the five-year period that began with its fiscal year ended February 28, 1987, and ended with its fiscal year ended February 28, 1991, was attributable in part to petitioner's expensing in its financial statements for certain of those years (i.e., its fiscal years ended February 29, 1988, and February 28, 1990) substantial amounts of compensation that were partially attributable to services Mr. Ruf provided during fiscal years other than those for which such amounts were expensed.

In its financial statement for its fiscal year ended February 29, 1988, petitioner expensed $871,000 pursuant to the 1987 deferred compensation arrangement. That was the only expense petitioner reflected in its financial statements for the years at issue with respect to that arrangement. Although that amount was expensed in its entirety in petitioner's financial statement for its fiscal year ended February 29, 1988, we have

found on the record before us that petitioner intended most of the amount it paid Mr. Ruf pursuant to the 1987 deferred compensation arrangement to be compensation for services he provided to petitioner during its fiscal year ended February 28, 1987, and the balance to be compensation for services he provided during its fiscal years ended February 29, 1988, and February 28, 1989. If petitioner had reflected the amount it expensed pursuant to that arrangement for the years during which he provided the services for which petitioner intended to compensate him, rather than entirely for its fiscal year ended February 29, 1988, its net profit for each of its fiscal years ended February 28, 1987, and February 28, 1989, would have decreased, and its net profit for its fiscal year ended February 29, 1988, would have increased by an amount correlating to the total amount of the decreases in net profit for those other two years, thereby changing the pattern of declining profits on which respondent relies.

Similarly, although petitioner expensed in its financial statement for its fiscal year ended February 28, 1990, $2,600,000 of compensation it paid Mr. Ruf during that year, we have found on the record before us that petitioner intended that amount to be compensation to Mr. Ruf for services he provided to it during its fiscal years ended February 29, 1988, February 28, 1989, and February 28, 1990. If petitioner had expensed the $2,600,000 of compensation for its fiscal years during which he provided the

services for which petitioner intended to compensate him, rather than entirely for its fiscal year ended February 28, 1990, its net profit for each of its fiscal years ended February 29, 1988, and February 28, 1989, would have decreased, and its net profit for its fiscal year ended February 28, 1990, would have increased by an amount correlating to the total amount of the decreases in net profit for those other two years, thereby also changing the pattern of declining profits on which respondent relies.[24]

Conflict of Interest

The fourth category of factors identified by the Court of Appeals concerns whether some relationship exists between the company and the employee whose compensation is at issue that might permit the company to disguise nondeductible corporate distributions of income as compensation deductible under section 162(a)(1). Elliotts, Inc. v. Commissioner, 716 F.2d at 1246. Such a relationship exists in the instant case. Mr. Ruf was petitioner's sole shareholder during the relevant period. Situations in which an employee is the sole or controlling shareholder warrant close scrutiny. See id. "The mere existence of such a relationship, however, when coupled with an absence of dividend payments, does not necessarily lead to the conclusion

_____

[24] We also note that if we were to determine that any of the $2,600,000 of compensation petitioner expensed in its financial statement for its fiscal year ended Feb. 28, 1990, did not constitute reasonable compensation for that year or any other year, petitioner's net profit for that year would have increased.

that the amount of compensation is unreasonably high." Id. In situations in which a potentially exploitable relationship exists, such as the present case, the Court of Appeals indicated that the Court should make an inquiry from the perspective of an independent investor to determine whether the investor would be satisfied with the company's return on equity after the compensation at issue was paid. Id. at 1247.

Return on equity is calculated by dividing the net profit (after payment of compensation and taxes) by the shareholder's equity. Id. Respondent argues that we should use the beginning shareholder's equity to calculate return on equity. Petitioner argues that we should use the average of the beginning and yearend shareholder's equity to calculate that return. The Court of Appeals in the Elliotts, Inc. case calculated the return on equity using the yearend shareholder's equity. Following that approach, see Golsen v. Commissioner, 54 T.C. 742 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971), if we were to divide petitioner's net profit after taxes (but before utilization of net operating loss carryforwards/carrybacks) by its yearend shareholder's equity, as reflected in its financial statements for each of the years indicated, petitioner would have the following percentage return on equity:

| Year Ended | Percentage Return on Equity |
|---|---|
| Feb. 28, 1987 | 31 |

| | |
|---|---|
| Feb. 29, 1988 | 81 |
| Feb. 28, 1989 | 35 |
| Feb. 28, 1990 | 22 |
| Feb. 28, 1991 | 16 |

Unlike the situation presented in Elliotts, Inc. v. Commissioner, 716 F.2d 1241 (1983), we find on the instant record that petitioner's return on equity for the relevant years, regardless how it is calculated, is not a reliable indicator of the reasonableness of Mr. Ruf's compensation for the years at issue. The shareholder-employee in the Elliotts, Inc. case had been the sole shareholder of the taxpayer-corporation for 21 years prior to the years at issue therein. Elliotts, Inc. v. Commissioner, supra at 1242. In contrast, assuming arguendo that Mr. Ruf were an independent investor, petitioner's shareholder's equity does not appear to reflect accurately his investment in petitioner during the relevant years. Although the final purchase price that Mr. Ruf negotiated for petitioner's stock in November 1988 was $2,045,520, its yearend shareholder's equity as reflected in its financial statement for its fiscal year ended February 28, 1989, was only $1,129,000. We believe that an independent investor would be concerned with the return on his or her investment of $2,045,520, not the return on the shareholder's equity that reflected some prior shareholder's investment. In addition, petitioner's shareholder's equity was subject to large fluctuations during the relevant period due to Stanislaus' purchase of petitioner and its subsequent merger into it. In sum, on the

instant record, neither party has persuaded us that, assuming arguendo that Mr. Ruf were an independent investor, petitioner's shareholder's equity accurately reflected his investment in petitioner during the relevant years.

Moreover, even if the shareholder's equity accurately reflected Mr. Ruf's investment in petitioner for the relevant years, assuming arguendo that he were an independent investor during those years, the record does not contain any credible evidence of what an independent investor would have required as a reasonable return on equity for investing in petitioner. This is especially true given the fact that petitioner was on the verge of bankruptcy at the time Mr. Ruf became petitioner's CEO.[25]

Although under the facts and circumstances presented here we do not find petitioner's return on equity to be a reliable indicator of the reasonableness of Mr. Ruf's compensation for the years at issue, we find it significant that the compensation paid by petitioner to Mr. Ruf was approved by Mr. Neiman. From the time Stanislaus purchased petitioner in December 1986 and throughout the years at issue, Mr. Neiman retained an interest in petitioner both as a founder of a corporation who wished to see that corporation succeed and as a creditor who held notes for which petitioner was liable. In addition, from the time Stanis-

---

[25] We did not find the opinions expressed by either of petitioner's experts (viz., Dr. Barren and Dr. Vinso) on this issue to be helpful to the Court.

laus purchased petitioner in December 1986 until Mr. Ruf and the former shareholders agreed on a final purchase price for petitioner in November 1988, Mr. Neiman retained an interest in petitioner's profits and net worth in that the final purchase price for petitioner was to be calculated based on a formula using those amounts. Prior to, during, and after the years at issue, Mr. Neiman received and reviewed petitioner's financial statements, retained an office next to that of Mr. Ruf, and discussed petitioner's financial condition with Mr. Ruf.

During his testimony, Mr. Neiman indicated that he never objected to Mr. Ruf's compensation and believed that "it was right and proper." He also testified that although the original notes initially restricted the amount of cash that Mr. Ruf was able to withdraw from petitioner due to its poor cash position, Mr. Neiman intended for Mr. Ruf to be "justly compensated" as soon as the cash was available to do so. Thus, Mr. Neiman specifically approved the concept of retroactive compensation for Mr. Ruf as petitioner's financial situation improved.

Internal Consistency

The last category of factors identified by the Court of Appeals relates to whether the compensation at issue was paid pursuant to a structured, formal, and consistently applied program. Bonuses not paid pursuant to such plans are suspect. Elliotts, Inc. v. Commissioner, 716 F.2d at 1247.

After becoming petitioner's CEO, Mr. Ruf was subject to certain arrangements concerning compensation. For example, the $933,333 that petitioner paid to Mr. Ruf during its fiscal year ended February 28, 1989, was awarded pursuant to the 1987 deferred compensation arrangement. All of the arrangements concerning Mr. Ruf's compensation were terminated prior to petitioner's fiscal year ended February 28, 1990, and Mr. Ruf's compensation for that year was not determined pursuant to a plan.

Amounts of Reasonable Compensation

Based on our review of the entire record in this case, we find that, of the $933,333 that petitioner paid Mr. Ruf during its fiscal year ended February 28, 1989, pursuant to the 1987 deferred compensation arrangement, the following amounts are reasonable amounts of compensation paid for services Mr. Ruf provided to petitioner during the indicated years:

| Year Ended | Amount of Compensation |
|------------|------------------------|
| Feb. 28, 1987 | $733,333 |
| Feb. 29, 1988 | 100,000 |
| Feb. 28, 1989 | 100,000 |

We further find that, of the $2,600,000 that petitioner paid Mr. Ruf during its fiscal year ended February 28, 1990, the following amounts totaling $1 million are reasonable amounts of compensation paid for services Mr. Ruf provided to petitioner during the years indicated:

| Year Ended | Amount of Compensation |
|---|---|
| Feb. 29, 1988 | $600,000 |
| Feb. 28, 1989 | 400,000 |

We further find that the remaining $1,600,000 of the $2,600,000 that petitioner paid Mr. Ruf during its fiscal year ended February 28, 1990, was for services he provided during that year and that only $800,000 of that amount was a reasonable amount of compensation for those services.[26] Accordingly, we find that a total of $1,800,000 constitutes reasonable compensation within the meaning of section 162(a)(1) for which petitioner is entitled

---

[26] To summarize, based on our review of the entire record in this case, we find that the following are reasonable amounts of compensation to Mr. Ruf for the indicated years:

| Year Ended | Reasonable Compensation |
|---|---|
| Feb. 28, 1987 | $1,128,936 |
| Feb. 29, 1988 | 832,629 |
| Feb. 28, 1989 | 632,693 |
| Feb. 28, 1990 | 800,000 |
| Feb. 28, 1991 | 750,000 |

We note that in the notice, at trial, and/or on brief, respondent allowed the total amounts of compensation that petitioner deducted in its returns for its taxable years ended Feb. 29, 1988, Feb. 28, 1989, and Feb. 28, 1991. Respondent also conceded on brief the $73,117 of interest petitioner deducted in its Federal income tax return for its taxable year ended Feb. 28, 1989, that was related to the $315,603 of compensation awarded pursuant to the management agreement. Consequently, our findings herein affect petitioner's Federal income tax liability only for its taxable year ended Feb. 28, 1990, and not for its taxable years ended Feb. 29, 1988, Feb. 28, 1989, and Feb. 28, 1991.

to a deduction for its taxable year ended February 28, 1990.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered under Rule 155</u>.